UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | | |
|---|---|---|
| JOHN W. PARROTT | * | CIVIL ACTION NO. 10-0123 |
| VERSUS | * | JUDGE ROBERT G. JAMES |
| MICHAEL J. ASTRUE, COMMISSIONER, SOCIAL SECURITY ADMINISTRATION | * | MAG. JUDGE KAREN L. HAYES |

## REPORT & RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

## Background & Procedural History

John W. Parrott filed the instant application for Title II Disability Insurance Benefits on January 3, 2007. (Tr. 111-113). He alleged disability since July 31, 2006, because of asthma and a thyroid condition. (Tr. 124-125). The claim was denied at the initial stages of the administrative process. (Tr. 59-66, 71-73). Thereafter, Parrott requested and received a September 24, 2008, hearing before an Administrative Law Judge ("ALJ"). (Tr. 28-58). In a February 4, 2009, partially favorable decision, the ALJ awarded disability benefits with an onset date of July 10, 2008. (Tr. 7-27). However, he denied disability for the period prior to July 10, 2008, finding at Step Five of the sequential evaluation process that Parrott was able to make an adjustment to work that exists in substantial numbers in the national economy. *Id.* Parrott appealed the adverse decision to the Appeals Council. On December 11, 2009, however, the Appeals Council denied Parrott's request for review; thus the ALJ's decision became the final

decision of the Commissioner. (Tr. 1-3).

On January 28, 2010, Parrott sought review before this court. Succinctly stated, he contends that the ALJ's residual functional capacity assessment is not supported by substantial evidence.

## Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401. Substantial evidence lies somewhere between a scintilla and a preponderance. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, (5th Cir. 1994).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

2

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.  *See* 42 U.S.C. § 423(d)(2)(A).  Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

   The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows,

   (1)   An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

   (2)   An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

   (3)   An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

   (4)   If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

   (5)   If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See, Boyd v. Apfel*,  239 F.3d 698, 704 -705 (5th Cir. 2001);  20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of

performing work in the national economy and is therefore not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## Analysis

### I. Steps One, Two, and Three

The ALJ determined at Step One of the sequential evaluation process that Parrott did not engage in substantial gainful activity during the relevant period. (Tr. 14). At Step Two, he found that he suffers severe impairments of asthma and bipolar disorder. *Id*. The ALJ concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at Step Three of the process. (Tr. 15-16).

### II. Residual Functional Capacity

The ALJ next determined that Parrott retains the residual functional capacity to perform light work,[1] reduced by

---

[1] Light work entails:
> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

>an inability to work in exposure to temperature/humidity changes, dust, fumes, gasses, or other pulmonary irritants; an inability to work at heights or around dangerous moving machinery; a moderately limited ability to understand, remember, and carry out detailed instructions; a moderately limited ability to maintain attention and concentration for extended periods; a moderately limited ability to accept instructions and respond appropriately to supervision; and a moderately limited ability to set realistic goals or make plans independently of others.

(Tr. 16).[2]

The ALJ determined that as of July 10, 2008, when Parrott reached 55 years of age, his vocational factors and residual functional capacity compelled a finding of "disabled" pursuant to Medical-Vocational Rule 202.04. (Tr. 26). Plaintiff, of course, does not contest the favorable portion of the ALJ's decision – i.e., the period beginning on July 10, 2008. He also does not advance any challenge to the ALJ's residual functional capacity assessment of his physical impairment(s) during the relevant period. Rather, the sole focus of this appeal is the ALJ's residual functional capacity assessment of his mental impairment for the period prior to July 10, 2008. Accordingly, the court's review and recitation of evidence will be limited to this issue and period of time.

      a)     <u>Medical Chronology of Parrott's Mental Impairment During the Relevant Period</u>

Parrott did not list a mental impairment as a basis for disability. *See* Tr. 127. In January 2007, he acknowledged that he still got along with others; he just did not socialize much anymore. (Tr. 134). Although Parrott's primary care physician re-started him on Lexapro for depression in February 2007, (Tr. 201-202), there is no mention of depression in the physician's records just two weeks later. (Tr. 198-199).

On February 13, 2007, non-examining agency psychologist, Lea Perritt, Ph.D., completed a psychiatric review technique wherein she indicated that Parrott's non-specified affective

---

[2] The ALJ defined "moderate," as "more than a slight limitation in this area, but the individual is still able to function satisfactorily." (Tr. 17).

disorder was not severe. (Tr. 181-194). In so finding, Perritt noted that Parrott had advised her that he was not being treated for any mental condition by a psychological doctor. *Id*. Parrott further stated that he had been prescribed a low dose of Lexapro, with no refills, which he did not take on a regular basis. *Id*. On June 19, 2007, a second non-examining agency psychologist, Edward Stodola, Ph.D, affirmed the earlier determination by Dr. Perritt. (Tr. 278-291).

Until February 2008, there is little or no evidence in the medical record that plaintiff suffered from a significant mental impairment. On February 25, 2008, however, Parrott was hospitalized for several days with a diagnosis of major depression, recurrent, with severe psychotic features. (Tr. 313-314). At that time, Parrott reported feeling depressed since he separated from his wife about five years earlier. (Tr. 319). He reported homicidal and suicidal thoughts. *Id*. Upon admission, his Global Assessment of Functioning ("GAF") was 35. *Id*.[3] His GAF subsequently improved to 50. *Id*.[4]

In a February 25, 2008, clinical assessment, Parrott indicated that he had been experiencing increasing depression with suicidal and homicidal thoughts. (Tr. 346). He has been having these thoughts for the last few months. *Id*. He reported that he had suffered from depression for the last few years. *Id*. Parrott disclosed increased stress because of problems with his ex-wife and having been denied disability. *See* Tr. 348, 350.

On February 27, 2008, Aruna Gullapalli, M.D., saw Parrott for a psychiatric evaluation.

---

[3] A GAF of 31-40 is defined as "**[s]ome impairment in reality testing or communication** (e.g. speech is at times illogical, obscure, or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, DSM-IV, pg. 32 (emphasis in original).

[4] A GAF of 41-50 is defined as "**[s]erious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). DSM-IV, pg. 32.

(Tr. 321-322).  She indicated that his insight was fair, but his judgment was poor.  *Id*.

On March 5, 2008, Parrott was admitted to Solutions Behavioral Health's Partial Hospital Program ("Solutions").  (Tr. 361).  Upon admission, he had a diagnosis of major depression, recurrent, severe, without psychotic features, and to rule out bipolar disorder.  (Tr. 371).  He had a GAF of 50.  *Id*.  On March 20, 2008, Parrott stated that he had begun to drive to Kentucky to hurt his ex-wife, but then reconsidered.  (Tr. 368).  Instead, he punched his truck and hurt his arm.  *Id*.  On March 27, 2008, Parrott indicated that he hit his nephew to scare him because his nephew had taken his Klonopin.  (Tr. 367).

Parrott was discharged from Solutions on April 9, 2008, with a diagnosis of bipolar disorder and a GAF of 60.  (Tr. 363).[5]  Treatment notes from April 30, 2008, suggest that Parrott was doing better in general, as was his mood.  (Tr. 365).

On May 27, 2008, Parrott still reported problems with anger outbursts.  (Tr. 365).  His disability hearing was canceled, so he became angry and cursed out his lawyer.  *Id*.  He still had road rage.  *Id*.  However, his mood was fairly stable, and he was able to manage his anger better.  *Id*.

On May 29, 2008, Jack Noble, M.D., observed that Parrott was still having a lot of emotional problems.  (Tr. 378).  In a June 2, 2008, To Whom it May Concern letter, Dr. Noble wrote that Parrott was unable to ever work in his usual occupation or any other occupation for the next two to five years because of bipolar disorder.  (Tr. 398).

Dr. Gullapalli's notes from September 24, 2008, indicate that Parrott became angry at his disability hearing held earlier that day.  (Tr. 408).  Apparently at plaintiff's request, Dr. Gullapalli

---

[5]  A GAF of 51-60 is defined as "**[m]oderate symptoms** (e.g. flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, no friends, unable to keep a job).  DSM-IV, pg. 32.

7

also completed a medical source statement. (Tr. 404-46). She indicated on the form that Parrott suffered intermittent symptoms, and panic attacks that impair, to some extent, his ability to function outside the home. *Id*. Overall, Parrott's mental impairment imposed moderate limitations of functioning. *Id*. Nonetheless, he suffered marked limitations of functioning in three areas: his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; his ability to accept instructions and respond appropriately to criticism from supervisors; and his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id*.

On October 10, 2008, Paulette Cappel, LCSW, completed a psychosocial assessment. (Tr. 400-401). Parrott reported a history of angry outbursts at his ex-wife, family and co-workers for at least two years prior to his retirement in 2006. *Id*. At the time of the assessment, he indicated that he was experiencing extreme anxiety and occasional panic attacks. *Id*. Cappel diagnosed bipolar disorder, mixed, severe, without psychotic features. *Id*. She assigned a GAF of 50. *Id*. She had seen him for 17 sessions to date. *Id*. He continued to experience significant medical and psychosocial impairments. *Id*.

On October 24, 2008, Parrott was having some anxiety, but denied anger problems. (Tr. 407).

  b) <u>ALJ's Rationale</u>

In his decision, the ALJ noted that although plaintiff stopped working in July 2006, he did not begin treatment with a mental health professional until February 2008. Despite this seemingly transparent demarcation line denoting a significant deterioration in Parrott's mental condition (February 25, 2008), the ALJ settled upon a single residual functional capacity

assessment, applicable to the entire period under consideration.[6]  In so doing, the ALJ observed that Dr. Gullapalli's opinion was "most consistent" with his own determination; accordingly, he afforded her evaluation "significant weight." (Tr. 24).

Ordinarily, a treating physician's opinion on the nature and severity of a patient's impairment will be given *controlling* weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." 20 C.F.R. § 404.1527(d)(2).  "'[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation omitted).  However, an ALJ cannot reject a medical opinion without an explanation supported by good cause.  *See, Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000) (citations omitted).  Moreover, a contradictory report by a non-examining physician does not provide good cause to disregard the opinion of the treating physician or psychologist. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) (citation omitted).

Nonetheless, even in the absence of countervailing medical evidence from another examining physician, an ALJ may still reject the opinion of a treating physician – provided the ALJ "performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).  If, however, the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate, "absent other medical opinion evidence based on personal examination or treatment of the claimant," the ALJ is obliged to re-contact the treating physician for clarification.  *Id*. (emphasis added).

---

[6] The ALJ likely found it unnecessary to bifurcate his residual functional capacity assessment of Parrott's mental impairment because the limitations that he assigned did not impact his Step Five determination.

As recounted above, Dr. Gullapalli assigned moderate *and* marked limitations of functioning. (Tr. 405-406).[7] However, the ALJ discounted the portions of Dr. Gullapalli's evaluation that did not comport with his residual functional capacity assessment by remarking that Parrott had been "essentially stable" on his medication, and had not experienced any auditory or visual hallucinations. (Tr. 23-24). The ALJ also limited Parrott's anti-social tendencies to difficulties with his ex-wife. *Id*.

The ALJ's rationale, however, fails to explain how the absence of hallucinations precludes a finding of marked limitation of functioning. Similarly, it is not clear how the ALJ's impression that Parrott was "essentially stable" translates to a claimant's functional capacity. Although Parrott is clearly preoccupied with his ex-wife, he has demonstrated aggressive, anti-social behavior toward others, including his nephew, son, doctor, and lawyer. Moreover, the record suggests that it was the combined effect of Parrott's difficulties with his ex-wife and the state agency's denial of disability that precipitated the decline in Parrott's mental health.

In short, the ALJ's partial rejection of Dr. Gullapalli's evaluation is not supported by good cause. Instead, the ALJ appears to have autonomously derived plaintiff's mental residual functional capacity. In his decision, the ALJ simply adopted the mental limitations that he, himself, generated for purposes of the hearing. *See* Tr. 54. At the hearing, however, the ALJ acknowledged that he was "winging it with the mental limitations" because he did not have any mental treatment records before him at that time. *See* Tr. 55, 57. The ALJ added that he wanted to see what Dr. Gullapalli and the other doctors had to say, and that he would send Parrott to another doctor if necessary. *Id*. In the end, the ALJ modified Dr. Gullapalli's evaluation to suit his earlier, impromptu assessment. However, in the absence of any valid medical assessment or

---

[7] Gullapalli also indicated that several abilities were not significantly impaired at all. (Tr. 405-406).

other corroborating evidence to support the ALJ's mental residual functional capacity assessment,[8] the court is constrained to find that the ALJ's determination is not supported by substantial evidence. *See Williams v. Astrue*, 2009 WL 4716027 (5th Cir. Dec. 10, 2009) (unpubl.) ("an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions"); *Ripley v. Chater,* 67 F.3d 552, 557 -558 (5th Cir. 1995) (substantial evidence lacking where: no medical assessment of claimant's residual functional capacity, and claimant's testimony was inconsistent with ALJ's assessment); *Butler v. Barnhart*, Case Number 03-31052 (5th Cir. 06/02/2004) (unpubl.) (in the absence of medical opinion or evidence establishing that the claimant could perform the requisite exertional demands, the ALJ's determination is not supported by substantial evidence).

## III.     Step Five and Remand

Because the foundation for the Commissioner's Step Five determination for the period prior to July 10, 2008, was premised upon a residual functional capacity assessment that is not supported by substantial evidence, the court further finds that the Commissioner's ultimate conclusion that plaintiff is not disabled during this period also is not supported by substantial evidence.

## **Conclusion**

---

[8] Plaintiff's primary care physician, Dr. Noble, indicated that Parrott's bi-polar disorder would prevent him from working for two to five years. (Tr. 398). Although a physician's statement that a claimant is disabled or unable to work is accorded no special significance under the regulations, 20 C.F.R. § 404.1527(e)(1), it does reflect the physician's belief that the claimant suffers from an impairment that, at a minimum, significantly impacts his ability to work.

The court recognizes that non-examining agency psychologists indicated that Parrott's mental impairment was not severe. (Tr. 181-194, 278-291). These opinions, however, precede the decline in Parrott's mental health and his hospitalization that occurred in February 2008. Moreover, an ALJ may properly rely on a non-examining physician's assessment only when, *inter alia*, it does not contradict the findings of an examining physician. *Carrier v. Sullivan*, 944 F.2d 243, 246 (5th Cir.1991) (quoting, *Villa v. Sullivan,* 895 F.2d 1019,1024 (5th Cir. 1990)).

For the above-stated reasons,

**IT IS RECOMMENDED** that the Commissioner's decision be **REVERSED** and **REMANDED** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen  (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 2nd day of December 2010.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE